IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>vs.<br><br>CODY LLOYD SMITH,<br><br>          Defendant. | CR 24-165-BLG-SPW<br><br><br>ORDER ON MOTION TO<br>SUPPRESS |

Before the Court is Defendant Cody Lloyd Smith's Motion to Suppress. (Doc. 30). Smith is charged with being a Prohibited Person in Possession of a Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1). The charge arises from a traffic stop conducted on December 8, 2023, when Carbon County Sheriff's Office Deputy Dan Wildin pulled over a 2008 Chevrolet Impala driven by Smith. (Doc. 31 at 3–4). Smith seeks to suppress all evidence obtained from the stop, arguing that the stop was unlawfully prolonged and the subsequent search was not supported by probable cause. (Docs. 30, 31). The Government opposes the Motion. (Doc. 39).

The Court held a hearing on October 14, 2025, during which Deputy Wildin testified on behalf of the Government and Andy Falco Jiminez testified on behalf of

Smith. The Court finds the material facts are not disputed based on the parties'
briefing, the witnesses' testimony, and related video footage.

For the following reasons, the Court denies Smith's Motion.

## I. Background

On December 8, 2023, at approximately 10:57 p.m., Deputy Wildin was
traveling north on Highway 310 near Laurel, Montana and observed a vehicle drift
across the fog line before returning to its lane. (Doc. 39-1 at 2). As he continued to
follow, the vehicle swerved within its lane and accelerated rapidly to pass another
car. (*Id.*). Radar confirmed the vehicle was traveling at 91 miles per hour in a 65
mile-per-hour zone. (*Id.*). Deputy Wildin activated his emergency lights to initiate
a traffic stop. (*Id.*). Although the vehicle slowed, it did not immediately pull over.
(*Id.*). Deputy Wildin became concerned that the occupants might be attempting to
conceal drugs, alcohol, or other contraband. (*Id.*). After approximately one mile,
the vehicle stopped on the roadside. (*Id.*).

Deputy Wildin approached the driver's side of the vehicle and activated his
body camera. (*Id.* at 3). He informed the male driver, Smith, that he stopped the
vehicle for speeding and "swerving back and forth." (*Id.*). Smith provided a
Montana driver's license identifying himself, while the three passengers declined to
provide identification. (*Id.*). Smith admitted to speeding but attributed the swerving
to a mechanical issue with the vehicle. (*Id.*).

2

Deputy Wildin observed that Smith was repeatedly fidgeting with his hands, rubbing his face and head, and making quick, jerking head movements. (*Id.*). Additionally, Deputy Wildin testified that during their interaction, Smith had a small sunglasses case resting on his lap, which—based on Deputy Wildin's training and experience—he believed was a "drug kit." Suspecting possible substance use, Deputy Wildin asked Smith to exit the vehicle and placed him in the front seat of the patrol car while Wildin conducted a records check. (*Id.*). Deputy Wildin testified that before exiting the vehicle, Smith placed the sunglasses case inside the car.

While seated in the passenger seat, Smith continued to display behavior that Deputy Wildin associated with methamphetamine impairment. (*Id.*). When asked, Smith admitted to prior methamphetamine use but claimed he had not used recently and was not under the influence. (*Id.*). Deputy Wildin then inquired as to whether there were any illegal drugs in the car. (*Id.*). Smith first replied, "I don't know," but upon clarification, answered "no." (*Id.*).

Deputy Wildin determined he had reasonable suspicion to deploy his drug-detection dog, K-9 Beth, based on Smith's swerving and speeding, his jerking physical movements, the potential "drug kit," and his admission of prior drug use. (*Id.*). Deputy Wildin informed Smith that he was concerned about his ability to drive and advised him that K-9 Beth would be deployed to conduct a sniff of the vehicle. (*Id.*).

3

Deputy Wildin contacted dispatch requesting cover units for a canine sniff. (*Id.*). Dispatch advised the nearest unit was several miles away. (Doc. 40 at 8:59). Deputy Wildin then asked dispatch to contact Laurel Police Department. (*Id.* at 9:05). He advised Smith that he was being detained until another officer arrived. (*Id.* at 9:35).

Smith exited the vehicle and stood by the patrol car smoking cigarettes while Deputy Wildin waited. (Doc. 39-1 at 3). After approximately 16 minutes, a cover officer arrived. (Doc. 40 at 24:15). Once all occupants were outside, Deputy Wildin deployed K-9 Beth on the vehicle, allowing a passenger's pit bull to remain inside during the sniff. (Doc. 39-1 at 3).

K-9 Beth conducted an initial counterclockwise rotation around the vehicle, which Deputy Wildin described as a "cursory sniff" during his testimony. (Doc. 40 at 27:43). Deputy Wildin testified that, during this phase, he was trained to deploy K-9 Beth and follow behind her without intervening. He testified that he monitors for behavioral changes in the dog, such as a pause in her breathing or a shift in direction, which may signal the presence of narcotic odors. If the dog does not indicate during the cursory sniff—as was the case here—Deputy Wildin is trained to proceed with a "detail sniff," during which he guides the dog to areas where odors might escape the vehicle.

4

During the detail sniff, Deputy Wildin used his right hand to direct K-9 Beth along the door seams. (*Id.* at 27:43–28:34). K-9 Beth responded by placing her nose on the seams, sniffing low along the vehicle's body, and then rising onto her hind legs to sniff higher. (*Id.*). Deputy Wildin believed K-9 Beth exhibited alert behavior on both sides of the vehicle. (Doc. 39-1 at 3). According to his testimony, Deputy Wildin deployed K-9 Beth for a third rotation to further pinpoint the source of the odor.

During the third rotation, K-9 Beth jumped up, briefly glanced at nearby officers and suspects standing behind the vehicle, and then resumed sniffing the lower portion of the car. (Doc. 40 at 28:34–30:04). Deputy Wildin ended the deployment and returned K-9 Beth to the patrol vehicle. (*Id.*).

According to Deputy Wildin, K-9 Beth ultimately "indicated" near the front door seam on the passenger side. (Doc. 39-1 at 3). She exhibited "significant alert behavior" on both sides of the vehicle and again near the passenger-side front door seam. (*Id.*). Based on this behavior, Deputy Wildin believed that illegal drugs were either currently present in the vehicle or had recently been inside. (*Id.*).

After returning K-9 Beth to the patrol vehicle, Deputy Wildin informed Smith of the alert and requested consent to search the vehicle's interior. (*Id.* at 4). Smith did not provide a direct response, so Deputy Wildin advised him that he would be seizing the vehicle and applying for a search warrant. (Doc. 40 at 30:21–30:45).

5

Smith told Deputy Wildin that "the SWAT team" had "hit" the vehicle the previous week and remarked that he would have been "surprised" if the canine had not alerted to the vehicle. (*Id.*). Deputy Wildin subsequently issued Smith a citation for speeding at night and advised him that he would be contacted at a later date to retrieve the vehicle. (Doc. 39-1 at 4). The other officers provided courtesy rides for the passengers. (*Id.*). Deputy Wildin then impounded the vehicle pending a search warrant application. (*Id.*).

In addition, Deputy Wildin reviewed the criminal histories of all involved individuals. (*Id.*). He confirmed that Smith had prior convictions and charges for Driving Under the Influence of Drugs and for being a Felon in Possession of a Firearm. (*Id.*).

Deputy Wildin applied for and obtained a search warrant for the vehicle. (*Id.* at 4–5). On December 9, 2023, he executed the search. (*Id.* at 5). During the search, Deputy Wildin discovered a Taurus 9mm semi-automatic handgun on the floorboard in front of the driver's seat. (*Id.*). He also found a small quantity of methamphetamine, drug paraphernalia, and a set of digital scales. (*Id.*). Based on his discovery of a firearm in the vehicle, Deputy Wildin contacted ATF Special Agent Kirby Fanus to report these findings. (*Id.* at 6).

/ / /

/ / /

6

## II.    Legal Standard

A defendant may challenge the admissibility of evidence prior to trial under Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure, which governs motions to suppress evidence. The foundation for such challenges lies in the Fourth Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." This protection extends to all forms of seizure, including brief detentions that fall short of a formal arrest. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). "[T]he reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Id.*

"In order to effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, [the United States Supreme] Court . . . conferred upon defendants in federal prosecutions the right, upon motion and proof, to have excluded from trial evidence which had been secured by means of an unlawful search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968) (citing *Weeks v. United States*, 232 U.S. 383 (1914)). When law enforcement violates a defendant's Fourth Amendment rights, the exclusionary rule mandates that "all evidence seized as a result of the stop must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001). A defendant has the ultimate

burden of proof on a Fourth Amendment motion to suppress. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005).

## III.  Discussion

At the outset, the parties agree—and the Court concurs—that the initial traffic stop was lawful. (Doc. 31 at 9; Doc. 39 at 6–9). Deputy Wildin observed Smith drifting across the driving lane and recorded Smith traveling at 91 miles per hour in a 65 mile-per-hour zone. (Doc. 39-1 at 2). These observations provided sufficient justification for a lawful traffic stop. *See Whren v. United States*, 517 U.S. 806, 810 (1996) ("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

Given the legitimacy of the initial stop, the Court turns to the remaining issues: whether the stop was unlawfully prolonged and whether the subsequent search warrant was supported by probable cause.

### A.    Duration of the Stop

First, the stop was not unlawfully prolonged. It is well-established that a traffic stop constitutes a seizure under the Fourth Amendment. *Whren*, 517 U.S. at 809–10. A traffic stop is a "relatively brief encounter" that is "more analogous to a . . . *Terry* stop than to a formal arrest." *United States v. Taylor*, 60 F.4th 1233, 1239 (9th Cir. 2023) (citations omitted).

"When the police pull someone over for a traffic violation, the officer can obviously investigate that traffic infraction." *United States v. Ramirez*, 98 F.4th 1141, 1143–44 (9th Cir. 2024) (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). An officer may carry out the stop's mission, including "ordinary inquiries incident to the traffic stop." *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019) (citations and internal quotation marks omitted). These inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (quoting *Rodriguez*, 575 U.S. at 349).

Officers may also order the driver or passengers to exit the vehicle, request identification, and ask questions about travel without exceeding the scope of the stop. *Rodriguez*, 575 U.S. at 356 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977)); *United States v. Williams*, 419 F.3d 1029, 1031 (9th Cir. 2005). Each of these duties share the same purpose as traffic enforcement itself: "ensuring that vehicles on the road are operated safely and responsibly." *Landeros*, 913 F.3d at 868.

However, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez*, 575 U.S. at 350. In *Rodriguez*, officers lawfully stopped a driver for veering onto the shoulder of the road. *Id.* at 351. After issuing a warning,

9

returning the driver's documents, and completing all tasks related to the traffic violation, the officer nevertheless instructed the driver to exit the vehicle and conducted a dog sniff. *Id.* at 352. The sniff led to the discovery of methamphetamine. *Id.* The Supreme Court held that the dog sniff—though it only extended the stop by seven to eight minutes—was unconstitutional because it prolonged the seizure "beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." *Id.* at 350–51 (internal citations and quotation marks omitted).

More recently, the Ninth Circuit applied *Rodriguez* in the context of a traffic stop where a passenger refused to identify himself. *Landeros*, 913 F.3d at 864. The court held that officers may not prolong a stop simply because doing so seems "reasonable." *Id.* at 866–67. Instead, "a traffic stop may be extended to conduct an investigation into matters other than the original traffic violation only if the officers have reasonable suspicion of an independent offense." *Id.* at 867.

Here, Smith asserts that Deputy Wildin unlawfully expanded the scope of the initial traffic stop when he removed Smith from the vehicle and questioned the passengers about their identities. (Doc. 31 at 12–13). However, under the standards set forth in *Rodriguez* and *Landeros*, Deputy Wildin was permitted to order Smith out of the vehicle and to request identification from the passengers as part of the stop's mission. The deployment of K-9 Beth for a dog sniff, by contrast, "was

permissible only if it was (1) part of the stop's 'mission' or (2) supported by independent reasonable suspicion." *Landeros*, 913 F.3d at 868.

### 1.    Mission of the Stop

In contrast to ordinary inquiries incident to a traffic stop, a dog sniff is "a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Rodriguez*, 575 U.S. at 355 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)). Thus, "a dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* at 356.

Here, Deputy Wildin's deployment of K-9 Beth fell outside the mission of the traffic stop and therefore required independent reasonable suspicion.

### 2.    Independent Reasonable Suspicion

A traffic stop may be prolonged beyond its initial mission only if officers develop reasonable suspicion that the driver has committed an independent offense. *United States v. Steinman*, 130 F.4th 693, 704 (9th Cir. 2025). "Reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *Landeros*, 913 F.3d at 868 (internal quotation marks omitted) (emphasis in original).

This determination is based on the totality of circumstances, with appropriate deference to the inferences drawn by the officer on the scene. *United States v.*

*Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc); *United States v. Valdes-Vega*, 738 F.3d 1074, 1077–79 (9th Cir. 2013). "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause." *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000). While "a mere hunch is insufficient," the threshold for reasonable suspicion is "not . . . particularly high." *Valdes-Vega*, 738 F.3d at 1078 (citations omitted).

Here, Deputy Wildin's decision to deploy K-9 Beth, though it prolonged the traffic stop, was legally justified. He had developed reasonable suspicion that Smith was under the influence of methamphetamine and possibly in possession of illegal drugs. Smith was swerving and speeding and then took an "abnormally long time" to stop after Deputy Wildin activated his lights—behavior Deputy Wildin recognized as consistent with attempts to conceal contraband. (Doc. 39-1 at 2). Upon contact, Smith displayed signs of methamphetamine use, including fidgeting, face-rubbing, jerky movements, and difficulty keeping still. (*Id.* at 3). Deputy Wildin suspected that Smith might be in possession of a "drug kit" based on the presence of the small sunglasses case in his lap. (Obviously, it was dark outside when the stop occurred; no need for sunglasses.) When asked about illegal items in the vehicle, Smith first claimed uncertainty, then attempted to deny. (*Id.*).

/ / /

/ / /

12

Deputy Wildin's decision to deploy K-9 Beth was grounded in these observations and his training and experience. Considering the totality of the circumstances, his decision was justified by independent reasonable suspicion.

B.    *The Search Warrant*

Because the traffic stop was not unlawfully prolonged, the remaining inquiry is whether the search warrant was supported by probable cause. Smith argues probable cause was lacking because the canine sniff was unreliable, while the Government contends that the facts in the search warrant affidavit gave the issuing judge a substantial basis to determine that probable cause existed to search Smith's vehicle. The Court agrees with the Government.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Probable cause requires "only a 'fair probability,' not certainty," and must be assessed under the totality of the circumstances. *United States v. Hill*, 459 F.3d 966, 970 (9th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Under this framework, a neutral and detached magistrate must "make a common sense determination" that contraband or evidence of a crime will likely be found in the place to be searched. *United States v. Mendonsa*, 989 F.2d 366, 368 (9th Cir. 1993). In making this determination, courts may give weight to the

conclusions of experienced law enforcement officers regarding where evidence is likely to be located. *United States v. Fannin*, 817 F.2d 1379, 1382 (9th Cir. 1987).

Because of this deference, a finding of probable cause will be upheld so long as there is a "substantial basis" for concluding that the supporting affidavit established probable cause. *United States v. Clark*, 31 F.3d 831, 834 (9th Cir. 1994). Moreover, there is "a presumption of validity with respect to the affidavit supporting the search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978).

"Evidence from a trained and reliable handler about alert behavior he recognized in his dog can be the basis for probable cause," and "[w]hether a particular dog displays enough signaling behavior will depend on the facts and circumstances of each case." *United States v. Thomas*, 726 F.3d 1086, 1098 (9th Cir. 2013). The Government can establish a dog's reliability through "evidence of . . . satisfactory performance in a certification or training program." *Florida v. Harris*, 568 U.S. 237, 246 (2013).

Here, the Government proffered evidence that K-9 Beth is certified by the National Police Working Dogs Association (NPWDA) to detect methamphetamine, heroin, and cocaine. (Doc. 31-1 at 2). Deputy Wildin testified that he is a certified canine handler, having completed the requisite 200-hour training course.

However, Smith's expert witness, Andy Falco Jiminez, testified that the dog sniff was unreliable for several reasons. He asserted that Deputy Wildin and K-9

Beth were not properly trained. According to Falco Jiminez, Deputy Wildin misled the dog by running his hand along the seam of the vehicle doors, thereby influencing K-9 Beth's behavior. Falco Jiminez further testified that K-9 Beth should have been trained to sit as a clear indication rather than to "stop and stare." Moreover, in this instance, according to Falco Jiminez, K-9 Beth did not "stop and stare" but instead became excited upon noticing another dog inside the vehicle. Finally, Falco Jiminez suggested that the reliability of the sniff was further undermined because the search continued beyond two rotations.

Falco Jiminez testified that Deputy Wildin and K-9 Beth's behaviors were widely recognized as unreliable and deviated from what he described as "typical performance." However, his testimony relied largely on his own opinions and experience in dog training, with minimal scientific support. Smith does not dispute that Deputy Wildin and K-9 Beth were trained through a nationally accredited organization that considers its methods reliable, and both parties recognize that some variation exists in canine training methods.

Deputy Wildin stated in the affidavit that his canine alerted to the presence of dangerous drugs. As a certified handler who trained alongside K-9 Beth, Deputy Wildin was in the best position to determine whether she indicated. Although it may have been preferable for K-9 Beth to indicate in a more objectively observable manner, she was trained to alert in a way that Deputy Wildin could consistently and

reliably recognize. Deputy Wildin's training did not suggest that touching the car or the presence of another dog would render K-9 Beth unreliable, and while his training records may have been deficient in not specifying the blindness level of each session, that deficiency alone is insufficient to deem the dog unreliable. Taken together, the Court finds that the canine sniff was reliable.

Because the canine sniff was reliable, the search warrant was properly supported by the combination of the delayed stop, Smith's fidgety behavior, his prior methamphetamine use, and K-9 Beth's indicating on the vehicle. K-9 Beth's indication elevated Deputy Wildin's observations from reasonable suspicion to probable cause. Therefore, the warrant was valid, the subsequent search of the vehicle did not violate the Fourth Amendment, and the evidence obtained as a result should not be suppressed.

## IV.    Conclusion

IT IS HEREBY ORDERED that Defendant Cody Lloyd Smith's Motion to Suppress (Doc. 30) is DENIED.

DATED this 27th day of October, 2025.

Susan P. Watters
SUSAN P. WATTERS
United States District Judge